UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FELICIA N.,                               )    Case No. 5:20-cv-01471-SP
                    Plaintiff,            )
                                          )
        v.                                )    MEMORANDUM OPINION AND
                                          )    ORDER
KILOLO KIJAKAZI, Acting                   )
Commissioner of the Social Security       )
Administration,                           )
                                          )
                    Defendant.            )
                                          )
_____

## I.

## INTRODUCTION

On July 23, 2020, plaintiff Felicia N. filed a Complaint against defendant, the Commissioner of the Social Security Administration ("Commissioner"), seeking review of a denial of a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). The parties have fully briefed the issues in dispute, and the court deems the matter suitable for adjudication without oral argument.

Plaintiff presents two disputed issues for decision: (1) whether the

administrative law judge ("ALJ") failed to properly consider the opinion of treating physician Dr. Omid Zebarjadi; and (2) whether the ALJ erred in formulating plaintiff's residual functional capacity ("RFC") by failing to incorporate the opinion of consultative examiner Dr. Rashin D'Angelo and the ALJ's own findings regarding plaintiff's mental impairments. Mem. in Supp. of Pl.'s Compl. ("P. Mem.") at 12-23; *see* Def.'s Mem. in Supp. of Answer ("D. Mem.") at 4-11.

Having carefully studied the parties' memoranda, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly evaluated the Dr. Zebarjadi's opinion, but failed to properly consider plaintiff's mental impairments in formulating the RFC. The court therefore reverses the decision of the Commissioner denying benefits and remands the matter for further administrative action consistent with this decision.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was 36 years old on the alleged disability onset date, has a tenth grade education. AR at 60, 320. She has past relevant work as a caregiver or in-home health aide. AR at 51.

On July 20, 2016, plaintiff filed applications for a period of disability, DIB, and SSI, alleging an onset date of January 1, 2009. AR at 60, 74. Plaintiff claimed she suffered from a hip problem, sciatica, a herniated disk, scoliosis, a back problem, high cholesterol, a neck problem, depression, and a heart murmur. *See* AR at 61, 75. Plaintiff's applications were initially denied on March 2, 2017. AR at 124, 130.

Plaintiff requested a hearing, which the assigned ALJ held on July 11, 2019. AR at 37. Plaintiff, represented by counsel, appeared and testified at the hearing. AR at 41-50. The ALJ also heard testimony from Susan Moranda, a vocational expert. AR at 50-57. The ALJ denied plaintiff's claims on July 29, 2019. *See* AR

at 17-29.

Applying the well-established five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.  AR at 19.

At step two, the ALJ found plaintiff suffered from the following severe impairments: cervical and lumbar spine degenerative disc disease with radiculopathy; and bilateral hip osteoarthritis.  *Id.*  The ALJ also found plaintiff suffered from the non-severe impairments of pneumonia/colitis, mild emphysema/bullous disease, dyslipidemia, cardiomyopathy, chest pain, shortness of breath, depression, and anxiety.  *See* AR at 19-20.

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR at 22.

The ALJ then assessed plaintiff's RFC,[1] and determined she had the ability to perform:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except she requires the flexibility to alternate positions between sitting
> and standing every 30 minutes; she can never crawl or climb ladders,
> ropes, or scaffolds; she can occasionally climb ramps and stairs,
> balance, stoop, kneel, and crouch; she can occasionally reach
> overhead and frequently reach in all other directions; she can tolerate
> occasional exposure to extreme cold, extreme heat, vibration, and

---

[1]  Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations.  *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 nn.5-7 (9th Cir. 1989) (citations omitted).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

1   atmospheric conditions such as odors, dusts, gases, fumes, and poor

2   ventilation; she can tolerate no exposure to hazards such as

3   unprotected heights and moving mechanical machinery.

4   *Id.*

5        The ALJ found, at step four, that plaintiff was unable to perform any past

6   relevant work.  AR at 27.

7        At step five, the ALJ considered the plaintiff's age, education, work

8   experience, and RFC, and found plaintiff could perform jobs that exist in

9   significant numbers in the national economy, including charge account clerk, small

10   parts assembler, and general office assistant.  *See* AR at 28-29.  The ALJ therefore

11   concluded plaintiff was not under a disability, as defined in the Social Security

12   Act, at any time from January 1, 2009 through the date of his decision.  AR at 29.

13        Plaintiff filed a timely request for review of the ALJ's decision, but the

14   Appeals Council denied the request for review on May 20, 2020.  AR at 1.

15   Accordingly, the ALJ's decision became the final decision of the Commissioner.

16                      **III.**

17                **<u>STANDARD OF REVIEW</u>**

18        This court is empowered to review decisions by the Commissioner to deny

19   benefits.  42 U.S.C. § 405(g).  The findings and decision of the Social Security

20   Administration ("SSA") must be upheld if they are free of legal error and

21   supported by substantial evidence.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th

22   Cir. 2001) (as amended).  But if the court determines the ALJ's findings are based

23   on legal error or are not supported by substantial evidence in the record, the court

24   may reject the findings and set aside the decision to deny benefits.  *Aukland v.*

25   *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d

26   1144, 1147 (9th Cir. 2001).

27        "Substantial evidence is more than a mere scintilla, but less than a

28

preponderance." *Aukland*, 257 F.3d at 1035 (citation omitted).  Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted); *Mayes*, 276 F.3d at 459.  To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion." *Mayes*, 276 F.3d at 459.  The ALJ's decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Aukland*, 257 F.3d at 1035 (internal quotation marks and citation omitted).  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "may not substitute its judgment for that of the ALJ." *Id.* (internal quotation marks and citation omitted).

## IV.

## DISCUSSION

### A.    The ALJ Properly Discounted Dr. Zebarjadi's Treating Opinion

Plaintiff's first argument is that the ALJ improperly rejected her treating physician's opinion.  P. Mem. at 12-19.  Defendant concedes, and the ALJ acknowledged, that Dr. Omid Zebarjadi had a treating relationship with plaintiff. AR at 27; D. Mem. at 5.

### 1.    Legal Standard

To determine whether a claimant has a medically determinable impairment, the ALJ considers different types of evidence, including medical evidence.  20 C.F.R. §§ 404.1527(b), 416.927(b).[2]  The regulations distinguish among three

---

[2]    The SSA issued new regulations effective March 27, 2017.  All regulations cited in this section are effective for cases filed prior to March 27, 2017.  *See* 20 C.F.R. §§ 404.1527(b), 416.927(b).

5

types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians.  20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (as amended).  "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.027(c)(1)-(2).  The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant.  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Nevertheless, the ALJ is not bound by the opinion of a treating physician.  *Smolen*, 80 F.3d at 1285.  If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight.  *Id.*  If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons, supported by substantial evidence, for rejecting it.  *Id.*  "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."  *Lester*, 81 F.3d at 831 (citations omitted).  Additionally, the opinions of a specialist about medical issues related to his or her area of expertise are entitled to more weight than the opinions of a non-specialist.  *Smolen*, 80 F.3d at 1285.

### 2. Dr. Zebarjadi's Treating Opinion

On August 28, 2017, Dr. Zebarjadi filled out a medical source statement regarding plaintiff's physical functional abilities.  *See* AR at 588-89.  In the form, he diagnosed her with spinal stenosis and opined that her symptoms would often interfere with the attention and concentration needed to perform simple work tasks.

*See* AR at 588.  He opined that in an eight-hour workday, she would have to recline or lie down for longer than the amount of time that is usually given to workers for breaks.  *See id.*  He also concluded that she could only walk one to two city blocks without rest or significant pain, sit for three hours in an eight-hour workday, and stand or walk for one hour in an eight-hour workday.  *See id.*  She also would need to take five to six unscheduled breaks of about fifteen minutes each during an eight-hour workday.  *See id.*

Dr. Zebarjadi further opined that plaintiff could lift and carry less than ten pounds frequently and ten pounds occasionally, but never twenty or more pounds in a work situation.  *See id.*  He determined she has limitations with repetitive reaching, handling, and fingering.  *Id.*  He opined that in an eight-hour workday, she could use her right hand and fingers to grasp, turn, twist, or manipulate objects only about 70 percent of the time, or 80 percent of the time with her left hand and fingers.  *Id.*  Finally, he estimated that she would likely be absent from work more than four times a month due to her impairments or treatments.  AR at 589.

### 3.  The ALJ's Findings

The ALJ was not persuaded by Dr. Zebarjadi's opinion and gave it little weight.  AR at 27.  Plaintiff acknowledges that Dr. Zebarjadi's opinion was contradicted by the consultative opinions of the State agency medical consultants.  P. Mem. at 14-15.  The State physicians reviewed plaintiff's medical record and determined that she was capable of performing a range of work at the light exertional level.  *See* AR at 26 (citing AR at 60-87, 90-119).  The ALJ gave those opinions partial weight because he determined that more restrictive exertional, postural, reach, and environmental limitations were warranted.  *See id.*

Because Dr. Zebarjadi's opinion was contradicted by another doctor's opinion, the ALJ needed to provide specific and legitimate reasons, supported by substantial evidence, to reject it.  *See Smolen*, 80 F.3d at 1285.  Here, the ALJ

1  provided three separate reasons for discounting Dr. Zebarjadi's opinion: First, the

2  ALJ found the checklist-style form appeared to have been completed as an

3  accommodation to plaintiff and did not explain the rationale for Dr. Zebarjadi's

4  opinion.  *See* AR at 27.  Second, Dr. Zebarjadi's opinion was inconsistent with his

5  own treatment notes.  *See id.*  Third, the extreme limitations assessed by Dr.

6  Zebarjadi contrasted sharply with the other evidence in the record, including

7  objective diagnostic findings.  *See id.*

8            **a.**    **Lack of Supporting Clinical Findings**

9  As a preliminary matter, the ALJ commented that Dr. Zebarjadi appeared to

10  have provided his opinion as an accommodation to plaintiff.  AR at 27.  To the

11  extent the ALJ held that against the opinion, that part of the ALJ's reasoning was

12  devoid of substantial evidence.  *See Alicia B. v. Berryhill*, 2019 WL 1081208, at *9

13  (C.D. Cal. Mar. 7, 2019) ("An ALJ may not reject a treating physician's opinion

14  based on mere speculation concerning the basis for the physician's opinion."

15  (citing *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995))).

16  The ALJ also determined that the physical limitations assessed by Dr.

17  Zebarjadi were conclusions without any rationale or citation to medical records.

18  AR at 27.  In particular, the ALJ noted that Dr. Zebarjadi's own treatment notes

19  contained little to no evidence of clinical findings relating to plaintiff's orthopedic

20  issues of her neck, back, and hips.  *See id.* (citing AR at 705-811, 1006-15).

21  Plaintiff argues the ALJ impermissibly discounted Dr. Zebarjadi's opinion

22  simply because it was on a check-the-box form.  *See* P. Mem. at 14-15.  She

23  contends that "Dr. Zebarjadi's years of visits with Plaintiff obviously formed the

24  basis of his opinion on her limitations."  *Id.* at 14.  She argues that Dr. Zebarjadi

25  also supported his opinion with reports from other specialists.  *See id.* at 15.

26  Plaintiff's contention is not supported by a single citation to the record.

27  Instead, defendant correctly points out that physical examinations from

28

8

1    appointments with Dr. Zebarjadi did not include any muscoskeletal exams.  *See*

2    AR at 711, 715, 719, 723, 727, 731, 735, 739, 743, 747, 751, 758, 760-61, 763-64,

3    766, 769, 778, 781, 784.[3]  Dr. Zebarjadi's treatment notes from the day of his

4    opinion indicate that no muscoskeletal examination took place on that day either.

5    *See* AR at 751.

6           Plaintiff is correct that ALJs cannot reject check-the-form opinions simply

7    because of their format.  "While an opinion cannot be rejected merely for being

8    expressed as answers to a check-the-box questionnaire, . . . the ALJ may

9    permissibly reject check-off reports that do not contain any explanation of the

10   bases of their conclusions . . . ."  *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020)

11   (cleaned up).  Dr. Zebarjadi's opinion lacked any explanation for his conclusions,

12   so it appears the ALJ could have discounted it solely for that reason.  But the Ninth

13   Circuit has also said that ALJs may not reject treating opinions in check-the-box

14   format even if they are "not accompanied by comments, and did not indicate to the

15   ALJ the basis for the physician's answers."  *Trevizo v. Berryhill*, 871 F.3d 664, 677

16   n.4 (9th Cir. 2017) (citation omitted).  The court need not resolve this apparent

17   conflict because in this case the ALJ actually reviewed Dr. Zebarjadi's treatment

18   notes before concluding that his opinion lacked objective medical support.  *See* AR

19   at 27 (noting that the ALJ considered plaintiff's longitudinal treatment history by

20   Dr. Zebarjadi).

21          For these reasons, the court concludes the ALJ properly found that Dr.

22   Zebarjadi's opinion was brief, conclusory, and inadequately supported by clinical

23   findings.  This was a specific and legitimate reason to discount the opinion.  *See*

24   *Ford*, 950 F.3d at 1154 ("The ALJ need not accept the opinion of any physician,

25

26   _____

27   [3]    Not all of the medical records cited by the ALJ and defendant are actually
     from examinations conducted by Dr. Zebarjadi.  *See, e.g.*, AR at 753-55, 771-76,

28   786-800, 1006-15.

1 including a treating physician, if that opinion is brief, conclusory, and inadequately

2 supported by clinical findings." (cleaned up)); 20 C.F.R. § 404.1527(c)(3) ("The

3 more a medical source presents relevant evidence to support a medical opinion,

4 particularly medical signs and laboratory findings, the more weight we will give

5 that medical opinion.").

### b.      Inconsistencies With Own Treatment Notes

7      The ALJ next noted that Dr. Zebarjadi's opinion was contradicted by his

8 own treatment notes, which indicated that plaintiff's pain was controlled with

9 medications. *See* AR at 27 (citing AR at 749). Indeed, in his treatment notes from

10 August 28, 2017, the same day of his opinion, Dr. Zebarjadi noted that "[p]ain is

11 controlled with current Rx regimen which reduces pain severity from 8/10 to

12 3/10." AR at 749.

13      Plaintiff argues that Dr. Zebarjadi's opinion is consistent with other pain

14 reports from before and after the date of the opinion. P. Mem. at 18. For instance,

15 throughout 2017, plaintiff reported high levels of pain (i.e., 6/10 up to 10/10). *See*

16 *id.* (citing AR at 951, 960, 963, 971, 974, 977, 980, 985, 990). The pain remained

17 at around 6/10 to 8/10 in 2018.[4] *See id.* (citing AR at 902, 910, 912, 915, 919, 922,

18 935, 941). Based on this evidence, plaintiff argues the ALJ improperly cherry

19 picked an outlier to discount the opinion. *See id.*

20      Plaintiff's argument is not convincing because the pain reports she cites

21 come from other providers' treatment records, not Dr. Zebarjadi's. There is a

22 difference between the consistency of a provider's opinion with his or her own

23 treatment notes, and its consistency with the rest of the objective medical record.

24 That difference is particularly important where, as here, there is no evidence Dr.

25 Zebarjadi relied on other medical evidence to formulate his opinion. Plaintiff

26

27      [4]  Plaintiff's claim is confusing because the record she cites actually contains

28 multiple reports that her pain was 10/10. *See* AR at 902, 912, 919.

10

claims Dr. Zebarjadi did base his opinion in part on "the reports from specialists which he referred Plaintiff to," but she fails to cite any actual evidence of that. *See* P. Mem. at 15. Plaintiff bears the initial burden of proving disability. *Reddick*, 157 F.3d at 721 (citations omitted). That includes the burden of supporting the medical opinions she relies on to prove she is disabled.

In sum, there is no evidence that Dr. Zebarjadi considered any pain reports other than those in his own treatment notes, which indicated that plaintiff's pain was controlled at a 3/10 with medication. Thus, the ALJ did not err in finding that Dr. Zebarjadi's treatment records of plaintiff's pain reports contradict the extreme physical limitations he assessed. This too was a specific and legitimate reason, backed by substantial evidence, to discount Dr. Zebarjadi's opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician . . . ." (citations omitted)); *Hurtado v. Colvin*, 2014 WL 4925225, at *3-4 (E.D. Cal. Sept. 29, 2014) (accepting ALJ's finding that treatment notes stating that plaintiff's pain was stable with medication contradicted the provider's assessments of extreme limitations).

### c.    Inconsistency With the Objective Medical Record

The ALJ also concluded that Dr. Zebarjadi's opinion was not supported by the objective medical findings, which generally showed mild to moderate degenerative changes of the lumbar spine and moderate changes of the cervical spine. AR at 27. The ALJ noted that there was no evidence of more significant findings such as nerve root encroachment that might support Dr. Zebarjadi's highly restrictive functional limitations. *See id.*

In describing the objective medical evidence, the ALJ began by recognizing that plaintiff had degenerative changes in the cervical spine, lumbar spine, and

hips.[5]  AR at 23-24.  As far back as February 2012, an examination of plaintiff's cervical spine revealed loss of lordosis and mild degenerative spondylosis at C4-C6, but was otherwise generally unremarkable.  AR at 24 (citing AR at 861).

On June 5, 2015, an X-ray of plaintiff's cervical spine showed no more than mild degenerative changes.  *See id.* (citing AR at 619).  On June 26, she presented to an emergency room, exhibiting tenderness to palpation at the right sciatic nerve, but received only conservative medication treatment.  *See id.* (citing AR at 439-41).  On October 28, 2015, she exhibited tenderness in the paraspinous muscles and sacroiliac joints and positive facet loading, but no signs of numbness or weakness in any extremity.  *See id.* (citing AR at 494).  Subsequent examinations through January 7, 2016 resulted in similar findings.  *See id.* (citing AR at 491-93).

During an examination on April 21, 2016, plaintiff showed tenderness in the cervical paraspinous muscles, ambulated with an antalgic gait, and had limited heel/toe walk.  AR at 25 (citing AR at 602).  Four days later, an X-ray of the lumbar spine showed only mild multilevel disc disease at L1-S1.  *Id.* (citing AR at 696).  On May 11, an examination revealed plaintiff had an antalgic gait on the right, left hip pain with internal rotation, and full range of motion.  *Id.* (citing AR at 404-07).  An MRI of the lumbar spine from May 17 showed mild to moderate bilateral facet disease at L5-S1 and mild levoscoliosis at L4-L5 with mild to moderate bilateral facet disease resulting in mild to moderate bilateral neural foraminal stenosis.  *See id.* (citing AR at 467-68).  An MRI of the left hip from May 27 revealed a subchondral cyst along the anterosuperior border of the femoral neck, but otherwise only bursitis and tendinitis.  *Id.* (citing AR at 469).  In June, an examination showed plaintiff had antalgic gait, tenderness in her paraspinous muscles, positive facet loading, and focal numbness and weakness in the

---

[5]  Among the records the ALJ cites are medical records belonging to a different male individual.  *See* AR at 24 (citing AR at 633-41).

extremities. *Id.* (citing AR at 486). Examinations from October 20 and November 17 continued to show antalgic gait and tenderness in the lumbar spine area, but a straight leg raise test was negative. *Id.* (citing AR at 481-82).

As far as 2017 medical evidence, the record shows plaintiff received an epidural injection to the lumbar spine on February 21. *See id.* (citing AR at 517). Two days later, at an orthopedic examination, she exhibited tenderness to palpation in multiple areas including the bilateral L5 distribution. *See id.* (citing AR at 544). Her range of motion was not full, and it was hindered secondary to pain. *See id.* Her straight leg raise test was positive, and she showed slightly diminished motor strength and sensation of the lower extremities. *See id.* These findings were also noted during a March 20 examination. *See id.* (citing AR at 540-42). In April, a diagnostic study of the bilateral hips for complaints of pain or evidence of avascular necrosis came back normal. *See id.* (citing AR at 828). A May examination revealed ongoing lumbar spine tenderness, diminished range of motion, positive straight leg raise test, tight hamstrings, and slightly diminished motor strength and sensation in the lower extremities. *Id.* (citing AR at 974-76).

A July 18, 2017 MRI of the cervical spine showed C5-C6 moderate left neural foraminal osteogenic and less so discogenic stenosis with discogenic and osteogenic impression on the left anterior spinal cord and moderate left neuroforaminal stenosis. *Id.* (citing AR at 822-23). Other than that, the study revealed only mild degenerative changes of the cervical spine and no other evidence of stenosis or impingement. *See id.* Subsequent examinations through October showed similar findings of lumbar tenderness, diminished range of motion, diminished motor strength and sensation in lower extremities, and positive straight leg raising. AR at 25-26 (citing AR at 960-70). In November, an MRI of the bilateral hips showed only mild bilateral osteoarthritis, mild bilateral gluteus minimus and medius and hamstring tendinosis, and trace edema in each

13

trochanteric bursa.  AR at 26 (citing AR at 662-63).  At an examination in December, she had active painful range of motion bilaterally with diminished lower extremity strength and muscle tone.  *Id.* (citing AR at 678-80).  She also exhibited lumbar spine tenderness and diminished range of motion.  *Id.*

Regarding 2018 medical records, a February 21 MRI of plaintiff's lumbar spine showed posterior shallow disc herniation at L3-L4 and L4-L5, as well as multilevel lateral recess stenosis due to multilevel facet joint arthritis.  *Id.* (citing AR at 813).  She received a lumbar epidural injection in March.  *Id.* (citing AR at 926).  In April, an examination revealed tenderness to palpation in the back at the midline and paraspinal area, diminished range of motion secondary to pain, positive Spurling's maneuver in the left upper extremity, and decreased sensation to light touch in the left hand and multiple dermatomes.  *See id.* (citing AR at 919-21).  Motor strength was 5/5 and straight leg raise test was negative.  *Id.* Additional examinations through June also showed spinal tenderness, diminished range of motion, diminished sensation, and other evidence of radiculopathy.  *Id.* (citing AR at 912-18).  She received another lumbar spine epidural injection in September.  *Id.* (citing AR at 910).  Another examination in December showed tenderness to palpation in multiple areas including the bilateral L5 distribution with diminished range of motion, positive straight leg raising, tight hamstrings, and slightly diminished lower extremity sensation and motor strength.  *Id.* (citing AR at 902-03).  Pain management examinations through April 2019 remained consistent with these findings.  *Id.* (citing AR at 1035-49).

Plaintiff argues that the ALJ failed to consider several pieces of evidence that support stricter functional limitations in line with Dr. Zebarjadi's opinion. First, she contends the ALJ failed to mention that her February 2018 MRI showed disc protrusion at L4-L5 causing severe bilateral recess stenosis.  P. Mem. at 16 (citing AR at 26, 813).  Indeed, while the ALJ recognized that the MRI showed

1    multilevel lateral recess stenosis, he failed to consider the more specific finding of

2    severe bilateral recess stenosis at L4-L5.  Other courts have found that ALJs err in

3    failing to consider findings of severe stenosis.  *See Vincent v. Heckler*, 739 F.2d

4    1393, 1395 (9th Cir. 1984) (ALJ "must explain why significant probative evidence

5    has been rejected" (cleaned up)); *Worsham v. Colvin*, 2014 WL 2216092, at *2

6    (W.D. Wash. May 29, 2014) (finding that ALJ erred in failing to consider evidence

7    of severe tandem left neuroforaminal stenosis); *cf. Demison v. Astrue*, 2009 WL

8    1844478, at *3-5, 8 (C.D. Cal. June 25, 2009) (finding that ALJ erred by failing to

9    develop the record concerning plaintiff's spinal stenosis).  As such, the ALJ erred

10   in failing to consider this particular objective finding.

11        Second, plaintiff claims that the ALJ failed to consider consistent findings

12   from Dr. Anna Nikachina and other providers at a pain management clinic of

13   tenderness to palpation, positive straight leg raises, reduced sensation

14   corresponding to her L4-L5 stenosis, and diminished strength.  P. Mem. at 16-17

15   (citing AR at 515, 520, 525, 547, 903, 906, 935, 939, 955, 960, 963, 1035, 1041).

16   But the ALJ did repeatedly discuss similar findings.  *See* AR at 25-26 (citing AR at

17   540-42, 544, 678-80, 902-03, 912-21, 960-70, 974-76); *Williams v. Colvin*, 2015

18   WL 1408894, at *11 (N.D. Cal. Mar. 27, 2015) (finding that failure to specifically

19   discuss duplicative evidence was at most harmless error).

20        Third, plaintiff argues the ALJ failed to consider reports by surgical

21   consultant Dr. Jonathan Allen that plaintiff had difficulty transferring positions,

22   tenderness to palpation, reduced ranges of motion, and decreased sensation

23   throughout the hand.  P. Mem. at 17 (citing AR at 913, 953).  The records that

24   plaintiff cites, however, say nothing about difficulty transferring positions,

25   tenderness, or reduced ranges of motion.  *See* AR at 913, 953.  In any event, those

26   findings would also be duplicative of other evidence considered by the ALJ as

27   previously discussed.  *See supra*; AR at 26, 919-21 (noting plaintiff's decreased

28

1   sensation to light touch in the left hand and multiple dermatomes).

2       Fourth, plaintiff argues the ALJ did not consider physical therapy notes from

3   April 2018, which revealed severely reduced hip strength, including 1-/5 hip

4   abduction, 3/5 hip adduction, 4-/5 hip flexion, 0/5 hip extension, a variety of

5   positive objective tests, reduced muscle tone, and moderately decreased ranges of

6   motion.  P. Mem. at 17 (citing AR at 675).  Further, the most recent physical

7   therapy consultation from April 2019 revealed similar reduced ranges of motion

8   and strength readings from 4-/5 to 4/5.  P. Mem. at 17 (citing AR at 1046-47).  The

9   ALJ did consider treatment records showing plaintiff had diminished range of

10  motion and muscle tone.  *See* AR at 25-26 (citing AR at 544, 678-80, 902-03, 912-

11  21, 960-70, 974-76).  But the physical therapy notes regarding her hip strength –

12  especially the low measurements of 1-/5 hip abduction, 3/5 hip adduction, and 0/5

13  hip extension – appear to be significantly probative, and the ALJ should have

14  explained whether or not that evidence affected the RFC.  *See Gooden v. Colvin*,

15  2016 WL 6407367, at *7 (C.D. Cal. Oct. 28, 2016) (finding error where ALJ failed

16  to explicitly consider significance of physical therapy evidence implying some

17  physical work-related limitations); *Williams v. Berryhill*, 2019 WL 923749, at *12

18  (D. Nev. Feb. 1, 2019) (same).

19      In light of the ALJ's failure to consider significantly probative evidence as

20  explained, the court finds that inconsistency with the objective medical record was

21  not a legitimate reason, backed by substantial evidence, to discount Dr. Zebarjadi's

22  opinion.  The ALJ's error was harmless, however, because he provided two other

23  proper reasons to discount the opinion – lack of supportive clinical findings and

24  inconsistency with Dr. Zebarjadi's own treatment notes.  Accordingly, the court

25  finds that overall, the ALJ did not err in discounting Dr. Zebarjadi's treating

26  opinion.  Nonetheless, because the court is remanding the case on another ground

27  discussed below, on remand the ALJ should reconsider the objective medical

28

1  evidence, taking into account the findings of severe stenosis and reduced hip

2  strength.

3  **B.    The ALJ Erred in Failing to Consider Plaintiff's Mental Impairments**

4        **While Formulating the RFC**

5        Plaintiff argues the ALJ erred by failing to include any limitations in the

6  RFC consistent with Dr. Rashin D'Angelo's examining opinion and the ALJ's own

7  findings of mental impairment at step two.  *See* P. Mem. at 19-23.

8        At step two, the ALJ considered the four broad areas of mental functioning

9  outlined in the regulations for evaluating mental disorders and in the Listing of

10  Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR at 20.  These four

11  areas are also known as the "paragraph B" criteria.  *Id.*

12       The ALJ began his analysis by noting that plaintiff complained of a history

13  of depression and claimed she could not handle stress.  *Id.*  But the ALJ found no

14  evidence that she ever sought or received treatment from a mental health specialist.

15  *Id.*  Instead, she received Xanax from her primary treating physicians, and she

16  reported the medication adequately managed her symptoms.  *Id.* (citing AR at 705,

17  717).

18       The ALJ also considered the opinions of the State agency psychological

19  consultants, Drs. Mark Dilger and Nadine Genece, and the psychological

20  consultative examiner, Dr. D'Angelo.  *See* AR at 20-21.  On February 7, 2017, Dr.

21  D'Angelo, a psychological consultative examiner and licensed clinical

22  psychologist, evaluated plaintiff.  AR at 20 (citing AR at 497-501).  At the

23  examination, plaintiff complained of anxiety and depression.  *Id.* (citing AR at

24  497-98).  She exhibited several positive findings, including depressive mood, flat

25  affect, and slightly diminished delayed memory.  *Id.* (citing AR at 499).  She also

26  had problems with concentration, as she struggled slightly with serial sevens and

27  could not spell the word "world" backward.  *Id.*  Other findings were

28

unremarkable; her psychomotor activity was within normal limits, she maintained fair eye contact, was able to establish rapport with the examiner, exhibited no abnormalities in thought processes or content, and had intact insight and judgment. *Id.* (citing AR at 499-500). Dr. D'Angelo diagnosed her with depressive disorder not otherwise specified and determined a global assessment of functioning ("GAF") score of 70, indicating mild symptoms or difficulty functioning. *Id.* (citing AR at 500). He opined that she would have no more than mild limitations in mental functioning. *Id.* (citing AR at 500-01). The ALJ noted that Drs. Dilger and Genece also opined that plaintiff did not have a severe mental impairment and had no more than mild mental limitations. *See* AR at 21 (citing AR at 60-87, 90-119).

The ALJ gave these three psychological opinions great weight, finding they were consistent with the record as a whole. *Id.* In particular, the ALJ found the opinions were consistent with the medical evidence demonstrating that plaintiff's symptoms remained well-controlled and generally stable at no worse than a mild level with appropriate conservative treatment, and the absence of more significant positive objective psychiatric or psychological findings of mental impairment. *See id.*

Based on this evidence, the ALJ determined that plaintiff had only mild limitations in each of the four functional areas, which made her medically determinable mental impairments of depression and anxiety non-severe. *See* AR at 20-21 (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). The ALJ provided specific reasons for his findings for each particular functional area separately. *See id.* The ALJ also concluded that plaintiff's medically determinable mental impairments, considered individually and together, did not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities. AR at 20.

Before concluding his analysis, the ALJ explained that the limitations identified in the paragraph B criteria "are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." AR at 22. The ALJ noted that the mental RFC assessment used at steps four and five requires a more detailed assessment. *Id.* The ALJ ended by stating his RFC assessment reflected the degree of limitation he found as a result of his paragraph B analysis. *See id.*

In *Hutton v. Astrue*, the Ninth Circuit considered whether the ALJ erred by failing to include plaintiff's post-traumatic stress disorder ("PTSD") in his RFC analysis and in his hypotheticals to the vocational expert. 491 Fed. Appx. 850, 850 (9th Cir. 2012). At step two, based on a medical opinion, the ALJ determined that plaintiff had mild limitations in the area of concentration, persistence, or pace. *Id.* Because the ALJ found no limitations with respect to other functional areas, he classified plaintiff's PTSD as non-severe. *Id.* In its analysis, the court first recited the well-established principle that ALJs must consider even non-severe impairments in formulating the claimant's RFC. *Id.* (citing 20 C.F.R. § 404.1545(a)(2)). The court found the ALJ failed to do so. *Id.* The court explained that "[t]o determine [plaintiff's] RFC properly, the ALJ was required to consider [his] physical impairments and the 'mild' limitations his PTSD caused with concentration, persistence, or pace." *See id.* at 850-51.

Since *Hutton*, multiple courts have remanded social security cases due to the ALJs' failure to adequately address mild mental impairment limitations in formulating RFCs. *See Frary v. Comm'r of Soc. Sec.*, 2021 WL 5401495, at *10-12 (E.D. Cal. Nov. 17, 2021) (compiling caselaw finding error based on *Hutton*). In one such case, the court found error because the ALJ did not incorporate any mild mental limitations in the RFC despite affording the objective medical evidence of such limitations great weight. *See Aida I. v. Saul*, 2020 WL 434319, at

1   *4-5 (S.D. Cal. Jan. 28, 2020).

2        Nevertheless, other courts have held that *Hutton* does not apply where the

3   ALJ included at least some analysis of the plaintiff's mental impairments in his or

4   her RFC evaluation in conjunction with the express incorporation of the step two

5   findings. *Frary*, 2021 WL 5401495, at *17-19 (compiling cases that distinguished

6   *Hutton*); *Sanguras v. Saul*, 2021 WL 973940, at *5 (E.D. Cal. Mar. 16, 2021);

7   *George A. v. Berryhill*, 2019 WL 1875523, at *4-5 (C.D. Cal. Apr. 24, 2019).

8   Even a brief discussion of the evidence at the RFC stage will suffice, as long as it

9   is preceded by a more detailed discussion at step two. *See Denney v. Saul*, 2019

10   WL 4076717, at *7-8 (E.D. Cal. Aug. 29, 2019) ("The ALJ did not err in

11   addressing Plaintiff's mental impairments in great detail at step two and briefly at

12   step four."); *Frary*, 2021 WL 5401495, at *18 (same).  But "a hollow boilerplate

13   incorporation of the paragraph B criteria within the RFC" discussion is not enough.

14   *Frary*, 2021 WL 5401495, at *19; *Gates v. Berryhill*, 2017 WL 2174401, at *2-3

15   (C.D. Cal. May 16, 2017) ("[T]he 'consideration' requirement is met if the ALJ

16   actually reviews the record and specifies reasons supported by substantial evidence

17   for not including the non-severe impairment. . . . It is not sufficient, however, for

18   the ALJ to merely rely on boilerplate language." (cleaned up)).

19        Here, the ALJ carefully analyzed the evidence of plaintiff's mental

20   impairments at step two, but then completely omitted any further analysis in

21   formulating the RFC.  Relying on the oft-used boilerplate paragraph B language,

22   the ALJ recognized a more detailed assessment of the mental impairments is

23   needed in the RFC determination, but failed to deliver.  A more explicit

24   explanation was all the more important here because the ALJ gave great weight to

25   the opinions of the psychological consultants, all of which found at least some mild

26   functional limitations.  For instance, Dr. D'Angelo opined that plaintiff would have

27   mild limitations completing a normal workday or work week; accepting

28

instructions from supervisors; interacting with coworkers and the public; and handling usual stresses, changes, and demands of gainful employment. *See* AR at 500. As plaintiff points out, the vocational expert appeared to testify that even a mild limitation completing a normal workday or work week may preclude successful adjustment to other work. *See* AR at 57 (testifying that missing even three days of work per month "would be a deal breaker, that is not tolerated by the majority of employers in the competitive labor market"). And while a non-severe impairment "standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Social Security Ruling 96-8p).

Defendant is correct that the regulations "do not require the ALJ to include limitations in the RFC if the record supports a conclusion that the non-severe impairment does not cause a significant limitation in the claimant's ability to work." *Koshak v. Berryhill*, 2018 WL 4519936, at *8 (C.D. Cal. Sept. 19, 2018) (citations omitted). But the ALJ must still show his work and explain why he arrived at that conclusion. *See id.* (explaining that the ALJ must offer specific reasons supported by substantial evidence for not including the non-severe impairment in the RFC); *Mellow v. Saul*, 830 Fed. Appx. 882, 883 (9th Cir. 2020) (finding that when the ALJ gives great weight to the opinion of a medical source, the ALJ must explain his or her decision to not incorporate any assessed limitations from that opinion into the RFC).

For these reasons, the court finds the ALJ erred in failing to explain, as part of his RFC analysis, why he chose not to include any functional limitations related to plaintiff's mental impairments in the RFC. The court cannot determine whether the outcome at step five would be the same had the ALJ avoided this error. *See*

1 | *Aida I.*, 2020 WL 434319, at \*4-5 ("[T]he Court cannot determine how the VE

2 | would have testified had the specific mild functional limitations to which Dr.

3 | Nicholson had opined been included in the hypotheticals posed.").  As such, the

4 | court cannot say this error was harmless.

5 | ## V.

6 | ## REMAND IS APPROPRIATE

7 | The decision whether to remand for further proceedings or reverse and

8 | award benefits is within the discretion of the district court.  *McAllister v. Sullivan*,

9 | 888 F.2d 599, 603 (9th Cir. 1989).  It is appropriate for the court to exercise this

10 | discretion to direct an immediate award of benefits where: "(1) the record has been

11 | fully developed and further administrative proceedings would serve no useful

12 | purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting

13 | evidence, whether claimant testimony or medical opinions; and (3) if the

14 | improperly discredited evidence were credited as true, the ALJ would be required

15 | to find the claimant disabled on remand."  *Garrison v. Colvin*, 759 F.3d 995, 1020

16 | (9th Cir. 2014) (setting forth three-part credit-as-true standard for remanding with

17 | instructions to calculate and award benefits).  But where there are outstanding

18 | issues that must be resolved before a determination can be made, or it is not clear

19 | from the record that the ALJ would be required to find a plaintiff disabled if all the

20 | evidence were properly evaluated, remand for further proceedings is appropriate.

21 | *See Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*,

22 | 211 F.3d 1172, 1179-80 (9th Cir. 2000).  In addition, the court must "remand for

23 | further proceedings when, even though all conditions of the credit-as-true rule are

24 | satisfied, an evaluation of the record as a whole creates serious doubt that a

25 | claimant is, in fact, disabled."  *Garrison*, 759 F.3d at 1021.

26 | Here, remand is required because it is not clear whether plaintiff would be

27 | found disabled if all the evidence were properly considered.  On remand, the ALJ

28 |

shall reconsider the medical evidence and opinions and reassess plaintiff's RFC, including assessing any warranted functional limitations relating to plaintiff's mental impairments or explaining the exclusion of any such limitations.  The ALJ shall then proceed through steps four and five to determine what work, if any, plaintiff was capable of performing during the relevant period.

## VI.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.


DATED: March 29, 2022

SHERI PYM
United States Magistrate Judge